UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                                )
            Plaintiff,          )
                                )
    vs.                         )
                                )    Case No. S1-4:08CR0271 RWS (AGF)
HOSEA LATRON SWOPES,            )
                                )
            Defendant.          )

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motion filed by Defendant, Hosea

Latron Swopes.  Pretrial matters were referred to the undersigned United States

Magistrate Judge under 28 U.S.C. § 636(b).  Defendant filed a motion to suppress

evidence, statements and identification.  (Doc. # 22).  An evidentiary hearing was held on

July 15, 2008, and a supplemental hearing was held on July 25, 2008.  At the hearings,

the government presented the testimony of Detective ("Det.") Keith Paulitsch, who has

been employed with the St. Louis Metropolitan Police Department (SLMPD) for more

than six years; Det. James Murphy, who has been employed with SLMPD for almost

seventeen years; Det. Brian Davenport, who has been employed with SLMPD for nearly

eight years; and Det. Patrick Drennan, who has been employed with SLMPD for

approximately 20 years.  The witnesses were cross-examined extensively by defense

counsel.  Based on the testimony and evidence adduced and having had an opportunity to

observe the demeanor and evaluate the credibility of the witnesses, the undersigned

makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

<u>Arrest on October 2, 2007</u>

During the early morning hours of October 2, 2007, Det. Paulitsch was on patrol

with Det. Richard Wooderson in an unmarked car in the Wells/Goodfellow neighborhood

of the City of St. Louis, which is known to the police as an area of increased drug and

gun violence.  At 1:09 a.m., they received an all-points radio dispatch regarding an armed

robbery in the general area of the 5400 block of Dr. Martin Luther King Drive, which

was approximately five blocks away from where they were patrolling.  The radio dispatch

described the suspect as: black male, approximately 5' 8" tall, approximately 170 - 180

pounds, short hair, light skinned, and wearing a red and white striped shirt.  It further

advised that there was a gun involved.  Govt. Ex. M-2.

The dispatch had been the result of a 911 call made to the police by the victim,

Ms. Washington, at approximately 1:01 a.m.   Following receipt of the 911 call, other

officers from the 7th District met with the victim and interviewed her.  She again

provided a description of the suspect.  She advised the officers that she first encountered

the individual who later robbed her at a lounge at 5402 Dr. Martin Luther King Drive,

which is at the southwest corner of Dr. Martin Luther King Drive and Arlington.  They

were each at the lounge for some time, and during that time she conversed with the man

multiple times, as he had asked to borrow her lighter several times that evening.  She had

not known the man prior to that evening.  After Ms. Washington left the lounge, she went

to a liquor store nearby, where she saw the man again.  While inside the liquor store, Ms.

Washington asked the man if he wanted to go back to her place and play dominos, and he agreed. The man completed his purchase and exited the liquor store. When she left shortly thereafter, she looked outside for the man, but did not see him, so she began walking home. Approximately 600' from the liquor store, the man appeared again and robbed her at gunpoint. He stood directly in front of her and placed the gun to her chest. After the robbery, she returned to her home and made the 911 call. In the 911 call, which Dets. Paulitsch and Wooderson did not hear on the night in question,[1] Ms. Washington said that there were four suspects who had robbed her, one of whom had a weapon, but she did not clarify who had the weapon.

Following the police interview of Ms. Washington, a second call went out on the radio, at 1:17 a.m., which Det. Paulitsch and his partner received. Based on the interview, this dispatch provided the following further description of the suspect: a black male, in his early twenties, approximately 5' 8" - 5' 9" tall, weighing 175-185 pounds, with short hair and a moustache, light skin, and wearing a red, white, and black striped shirt and jeans. The gun was described as a small, black nine millimeter handgun. Id.

In response to the two radio dispatches – which was the only information Det. Paulitsch had received – Dets. Paulitsch and Wooderson responded to the area, traveling south on Arlington toward Dr. Martin Luther King Drive. Soon thereafter, Det. Wooderson observed someone matching the description of the suspect at the mouth of the alley near Patton, a street that runs parallel to Arlington. They approached in their

_____

[1] Det. Paulitsch did not hear the tape of the 911 call until the day before the initial evidentiary hearing in this matter.

vehicle, pulling up approximately 4-5 feet from the suspect, later identified as Defendant Swopes.  Seeing that the person matched the description he had heard on the radio and that he was wearing a red, white and black striped shirt, Det. Paulitsch wanted to investigate further.  Det. Paulitsch exited the vehicle and identified himself as a police officer.  He was wearing a black police vest with large white letters that said "POLICE." After he identified himself, Det. Paulitsch saw Defendant lift the front of his shirt and remove a black pistol.  Upon seeing this, Det. Paulitsch drew his firearm and told Defendant to drop his weapon.  Defendant dropped both the handgun and a can of beer he had been holding, and fled, running south on Arlington.  Dets. Paulitsch and Wooderson pursued Defendant on foot, and Det. Wooderson called in the pursuit and requested backup.  Det. Paulitsch had Defendant continuously in his sight, and saw him enter the first floor apartment of a four-family flat at 1521 Arlington.  In response to their call, other officers responded to the scene.

Approximately 10 - 15 minutes later the officers were able to enter the apartment, when the owner/lessor of the apartment permitted them to enter.  Two black males were at the front door as the officers entered, the apartment owner and Defendant Swopes. Det. Paulitsch recognized Defendant as the individual he had seen in the alley. Defendant was no longer wearing the striped shirt; he was now wearing a grey jacket over a white t-shirt, and jeans, but Det. Paulitsch recognized him from his facial features. They placed Defendant under arrest and read him his rights under <u>Miranda</u>.

The officers spoke to the owner of the apartment regarding Defendant's presence there, and he advised the officers that he had answered the door, and that Defendant had

entered the apartment and then gone into a bedroom and come back out. Det. Wooderson and other officers then searched the apartment, while Det. Paulitsch went to retrieve the handgun. In the bedroom adjoining the room the owner had seen Defendant enter, the officers located a red, white, and black striped shirt. Det. Paulitsch later identified it as the shirt he had seen Defendant wearing in the alley. The officers also located an unspecified amount of currency. The police report described Defendant, at the time of his arrest, as a black male, age 30, 6' tall, weighing 180 pounds, with short and straight hair, and light brown complexion. He was wearing a white shirt, grey jacket and black jeans. Govt. Ex. M-3. They checked Defendant's name in the computer and determined that he had an outstanding bench warrant for his arrest.

Defendant was thereafter detained on the front porch together with two or three other black males who had been inside the apartment. Defendant was in handcuffs, as was one or more of the other individuals detained. The others ranged in age from about 17 or 18 years old to approximately 25 years old. The victim, Ms. Washington, was brought to the scene in a police car to identify her assailant, while the Defendant and others were detained on the porch. She was met by Det. Wooderson, who supervised the identification process. Because Det. Wooderson was not available for the hearing,[2] there was no testimony regarding what conversation Det. Wooderson may have had with Ms. Washington prior to her viewing the men on the porch. Prior to the show-up beginning, however, Det. Davenport observed that Ms. Washington had been brought to the scene,

_____

[2] Det. Wooderson is in the military and was called up for active duty outside of the State of Missouri, and was therefore unavailable to testify at the hearing.

and he went and stood next to the police car and was able to see and hear the identification. He estimated this occurred at approximately 2:30 a.m. Ms. Washington remained seated in the police car, and each of the males who had been detained on the porch, including Defendant, was brought forward and the spotlight from the police vehicle was shined on each as he stood. When she saw Defendant, Ms. Washington immediately identified him as the person who had robbed her, saying something like "that was him." There was no hesitation in her voice. At the time of the identification, Defendant was not wearing the striped shirt in which he had previously been observed, but rather was wearing the clothes he had on at the time of his arrest.

While these events were transpiring at the apartment, Det. Paulitsch returned to the area in the alley where he first observed Defendant. Det. Paulitsch found a beer can and a black revolver in the same place where he had seen Defendant discard his can and firearm. The firearm was a .38 caliber revolver, loaded with six live cartridges. Govt. Ex. M-3. Det. Paulitsch then returned to 1521 Arlington, at which time Det. Wooderson advised him that Ms. Washington had positively identified Defendant Swopes as her assailant. Det. Paulitsch obtained further information from Ms. Washington at the scene. She advised him that $430 had been taken from her during the robbery. At some point, Ms. Washington was also shown the shirt that was seized from inside the apartment, as well as the handgun retrieved from the alley. She positively identified the shirt as having been worn by her assailant, and also identified the handgun as the firearm that had been used.

## Arrest on May 20, 2008

On May 20, 2008, Det. Murphy, then a detective in the intelligence/gang unit, received information that Defendant Swopes was wanted with regard to a federal warrant. At approximately 6:30 or 7:30 that evening, he and other officers, including Det. Drennan, went to the 1500 block of Arlington to attempt to find Defendant. Det. Murphy, who was familiar with Defendant from prior experience, saw Defendant seated on the front porch of 1521 Arlington.[3] He approached Defendant and asked him his name. In response, Defendant provided a false name, and further stated that he had no identification on him. Det. Drennan, who was also at the scene, had a picture of Defendant with him, which he displayed. They again asked Defendant his name, and he thereafter admitted that he was Hosea Swopes. He was taken into custody on the arrest warrant, and Det. Drennan advised Defendant of his rights under <u>Miranda</u>, in Det. Murphy's presence. Defendant stated that he understood his rights. He was searched incident to his arrest, and the officers located two live 9 millimeter rounds of ammunition. They asked Defendant where he had obtained the ammunition and if there was a firearm there. Defendant stated that he had found the bullets in an alley, and that there was no weapon. No threats or promises were made to induce Defendant to waive his rights or respond to the questions. At the time he did not appear to be intoxicated or suffering from any mental or physical infirmity.

Defendant was taken to police headquarters and booked on the outstanding

---

[3]    Defendant's address, as listed on Exhibit M-4, is identified as 1520 Arlington, which Det. Murphy testified is across the street from 1521 Arlington.

warrant. He was thereafter interviewed by Dets. Drennan and Malacheck in the intelligence office at police headquarters, approximately one hour after his arrest. They asked about the bullets that had been found on his person, and Defendant advised the detectives that someone had tried to sell him a zip gun, but that he had not wanted to buy the gun. He further stated that that same person had left the two bullets on the porch and that he (Defendant) had found them and put them in his pocket. Again, Defendant did not appear to be under the influence of any drugs or alcohol, and no threats or promises were made to induce his statement. The officers presented Defendant with a written warning and waiver form, and asked him if he wanted to reduce his statement to writing. Defendant refused to make a written statement, and also refused to initial the warning and waiver form. Govt. Ex. M-4.

## CONCLUSIONS OF LAW

In his motion, Defendant seeks to suppress the evidence from the October 2, 2007 arrest, asserting that the officers had no reasonable suspicion even to approach Defendant, and no probable cause to arrest him. He further seeks to suppress the identification made by Ms. Washington, contending that it was unduly suggestive and therefore violated his due process rights. Finally, Defendant seeks to suppress the statements made by him on May 20, 2008, asserting that the warrant leading up to the arrest was based on the tainted stop and identification on October 2, 2007.

### A.  <u>Approach on October 2, 2007</u>

In his motion, Defendant asserts that the officers lacked authority even to approach

Defendant. The case law, however, does not support this contention. Not all personal encounters between police and citizens involve "seizures" under the Fourth Amendment. See Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968). Consensual encounters between police and private citizens do not implicate the Fourth Amendment. Florida v. Bostick, 501 U.S. 429, 434 (1991); Florida v. Royer, 460 U.S. 491, 497 (1983); United States v. Dupree, 202 F.3d 1046, 1049 (8th Cir. 2000). "A Fourth Amendment 'seizure' does not occur merely because a police officer requests permission to search an area or poses other questions to a citizen." United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001); United States v. Woods, 213 F.3d 1021, 1023 (8th Cir. 2000) (citing United States v. Guerrero-Hernandez, 95 F.3d 983, 986 (10th Cir. 1996) (consensual encounter does not become custodial simply because individual being questioned is the target of an investigation)); United States v. Ward, 23 F.3d 1303, 1305-06 (8th Cir. 1994). Such encounters do not require any degree of suspicion. Bostick, 501 U.S. at 435; Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984). Here, the interaction with Defendant began as a consensual encounter, and the attempted consensual encounter did not become custodial simply because the defendant was the target of an investigation. Woods, 213 F.3d at 1022.

To the extent Defendant may be arguing that the encounter was actually an investigative detention, the Court finds no basis for any such assertion. There is no bright line distinguishing a consensual encounter from a Terry stop; the determination is a fact-intensive one that turns on the facts of the particular case. United States v. Beck, 140 F.3d 1129, 1135 (8th Cir. 1998); United States v. Hathcock, 103 F.3d 715, 718 (8th Cir. 1997). As the court noted in United States v. White, 81 F.3d 775 (8th Cir. 1996):

> A seizure does not occur simply because a law enforcement officer
> approaches an individual and asks a few questions or requests permission to
> search an area – even if the officer has no reason to suspect the individual is
> involved in criminal activity – provided the officer does not indicate that
> compliance with his request is required.

Id. at 779.  The determination of whether an encounter is consensual turns on whether the

questioning is so "intimidating, threatening or coercive that a reasonable person would

not have believed himself free to leave."  United States v. McKines, 933 F.2d 1412, 1419

(8th Cir. 1991) (en banc).  Factors include "the threatening presence of several officers,

the display of a weapon by an officer, some physical touching of the person or the

citizen, or the use of language or tone of voice indicating that compliance with the

officer's request might be compelled."  White, 81 F.3d at 779 (citations omitted).

Here, the officers initially did no more than pull up in an unmarked car, step out,

and identify themselves as police.  As such, at this stage there was no "detention"

requiring any degree of suspicion.  See United States v. Davis, 202 F.3d 1060, 1062 (8th

Cir. 2000) (finding consensual encounter where officers exited squad car, approached the

defendant, asked if he could speak to him, and conducted pat down);  United States v.

Dockter, 58 F.3d 1284, 1287 (8th Cir. 1995) (no seizure where police pulled up behind

car parked on side of road even though officer activated his flashing lights); United States

v. Angell, 11 F.3d 806, 809-10 (8th Cir. 1993) (finding encounter was a consensual one,

and that no seizure had occurred, where patrol officer shined his flashlight on defendant's

car, began to ask the occupants who they were and what they were doing, and said

something like, "Stay there, I want to talk to you.").  As the Eighth Circuit recognized in

United States v. Tarantola, 332 F.3d 498, 499 (8th Cir. 2003), "[Defendant's] position

that a person is 'seized' for Fourth Amendment purposes whenever an officer interrupts what that person was otherwise doing is absurd."

In any event, although no reasonable suspicion was necessary for the officers to stop their car and approach Defendant, it is nonetheless clear that once the officers pulled up and were able to observe Defendant, they were justified in conducting an investigatory detention. Police officers may briefly detain an individual for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." Terry, 392 U.S. at 30; United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). The test is an objective one, based on the totality of the circumstances. Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (officer's actions in light of facts and circumstances relevant to Fourth Amendment assessment, not officer's actual state of mind). Furthermore, the officer's reasonable belief is judged in light of the officer's experience under the circumstances. United States v. Johnson, 64 F.3d 1120, 1124 (8th Cir. 1995). The level of proof necessary is "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Socklow, 490 U.S. 1, 7 (1989). The reasonable belief requires suspicion based on "'particularized, objective facts which, when taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)). In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States

v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

Here the detectives determined that Defendant matched the description given by the victim and that he was wearing a distinctive shirt that also matched the description. They also observed Defendant late at night, in the area of the reported robbery, soon after it was reported. The Court concludes that on these facts, the detectives had reasonably articulable suspicion to conduct a Terry stop. See United States v. Fisher, 364 F.3d 970, 972-73 (8th Cir. 2004) (reasonable suspicion found where complainant, whose name they did not know, provided description and police observed individual matching description); United States v. Spotts, 275 F.3d 714, 718, 720 (8th Cir. 2002) (reasonable suspicion to stop defendant and ask him to get out of truck where truck had been seen driving by residence police were searching for methamphetamine lab and the officers had intelligence reports that the defendant dealt methamphetamine); United States v. Gonzalez, 220 F.3d 922, 925 (8th Cir. 2000) (reasonable suspicion of drug transport based on accomplice's information, including particulars of vehicle and direction of travel).

Even if there were any doubt about the existence of reasonable suspicion at the time they first identified themselves as police, there is no question that reasonable suspicion for a Terry stop was acquired once Defendant lifted his shirt, and removed his firearm. Indeed, at this point the officers had probable cause to arrest Defendant, and that probable cause increased once Defendant fled from the police. See United States v.

Anderson, 339 F.3d 720, 723 (8th Cir. 2003) (officers had probable cause to arrest defendant when police received precise descriptions from multiple anonymous callers, who provided matching descriptions, that truck driver had been walking along highway with a gun and threatening another truck driver, and driver attempted to drive off when officers attempted to stop him); United States v. Schaafsma, 318 F.3d 718, 722 (7th Cir. 2003) (finding flight contributed to probable cause); United States v. Jones, 204 F.3d 541, 543 (4th Cir. 2000) (finding that after viewing apparent drug transaction in area known for high drug traffic, officers had probable cause to arrest defendant who fled); United States v. Willis, 967 F.2d 1220, 1223 (8th Cir. 1992) (police officer who had a reasonable suspicion that "criminal activity might be afoot" had probable cause to arrest defendant who dropped bag and fled); United States v. Holloway, 962 F.2d 451, 461 (5th Cir. 1992) (reasonable suspicion before defendant's attempt to flee was elevated to probable cause by defendant's attempt at flight); United States v. Clark, 743 F.2d 1255, 1260 (8th Cir. 1984) (officer had probable cause to arrest defendant who suddenly fled when being questioned by postal inspectors about irregularities in incoming mail).

The Court need not determine the precise moment on the street when the officers acquired probable cause, however, for no arrest took place at this time. The Supreme Court has made plain that a Fourth Amendment seizure occurs only when the officers actually touch or apply physical force to the defendant, or the defendant submits to the show of authority by the police. "An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." California v. Hodari D., 499 U.S.

621, 626 (1991) (italics in original); accord United States v. Jackson, 175 F.3d 600, 601 (8th Cir. 1999);  United States v. Segars, 31 F.3d 655, 658 (8th. Cir. 1994); Cole v. Bone, 993 F.2d 1328, 1332-1333 (8th Cir. 1993).  Here, the officers did not touch Defendant, nor did Defendant submit to any show of authority.  Rather, as in Hodari D., Defendant refused to submit to any alleged show of authority and fled.  It was not until Defendant was finally arrested at the apartment that he first submitted to any show of authority.  At this point, the seizure first occurred.  Jackson, 175 F.3d at 601; Cole, 993 F.2d at 1332-33.  As such, any seizure of Defendant occurred well after the officers undeniably acquired probable cause based upon their first-hand observation of Defendant and the firearm, and Defendant's flight.  See Schulz v. Long, 44 F.3d 643, 648 (8th Cir. 1995) ("'[W]e scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment.'") (quoting Cole, 993 F.2d at 1333). Accordingly, Defendant's assertion that the officers improperly detained Defendant at the scene has no basis.

### B.  Arrest of Defendant on October 2, 2007

It is equally clear that the officers were authorized to arrest Defendant once they found him inside the apartment.  The arrest of a defendant is lawful even if made without a warrant, if the arrest is made with probable cause.  See United States v. Watson, 423 U.S. 411, 417 (1976); Gerstein v. Pugh, 420 U.S. 103 (1975); Beck v. Ohio, 379 U.S. 89 (1964).  This is true even when the felony alleged occurred outside of the presence of law enforcement officers.  Watson, 423 U.S. at 418.  Probable cause exists "when at the

moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested." United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003) (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001).  Officers are not required to rule out all innocent explanations, nor are they required to be able to prove a case beyond a reasonable doubt to effect a warrantless arrest.  Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("the probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances"); Illinois v. Gates, 462 U.S. 213, 225 (1983) ("Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision."); United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004) (probable cause where defendant appeared to be providing surveillance for another individual officer had cause to believe defendant was engaged in narcotics transactions).  Officers may also rely on information provided to them by victims or witnesses, especially where, as here, it is corroborated by their own investigation or observation.  See United States v. McKinney, 328 F.3d 993, 994 (8th Cir. 2003).

For the reasons discussed above, by the time they were able finally to apprehend Defendant inside the apartment, they had more than ample probable cause to arrest him.

### C.  Seizure of the Firearm, Clothing and Cash

The only challenge to the seizure of evidence Defendant makes herein is based on

his contention that it was the result of what he contends was an illegal stop and seizure of Defendant in October, 2007. Inasmuch as neither the initial approach nor the arrest of Defendant were improper, Defendant's argument with respect to the seizure of evidence also fails. See United States v. Lyton, 161 F.3d 1168, 1171 (8th Cir. 1998); United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994).

Nor could Defendant support an independent challenge to the seizure of the evidence on these facts. As a threshold matter, the Court notes that Defendant admitted at the hearing that he does not assert any privacy interest in the residence at 1521 Arlington, where he was arrested. As such, he lacks a sufficient privacy interest to challenge the search of the residence in which they found the striped shirt and the cash, which search they conducted with the owner's consent. Defendant does not contend otherwise. See Minnesota v. Carter, 525 U.S. 83, 90 (1998) (neither individuals who visit the home of another without spending the night nor individuals who visit the apartment of another to package cocaine, possess a sufficient privacy interest to raise Fourth Amendment interests); United States v. Sturgis, 238 F.3d 956, 958-59 (8th Cir. 2001) (defendant who visited motel room of another to engage in distributing controlled substances lacked reasonable expectation of privacy to trigger Fourth Amendment); see generally, United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999); United States v. Rodriguez-Arreola, 270 F.3d 611, 616 (8th Cir. 2001) (challenged conduct must invade

the defendant's legitimate expectation of privacy rather than third party).[4]

The officers were also justified in searching Defendant at the time of his arrest. United States v. Robinson, 414 U.S. 218, 224 (1973). A custodial arrest of a suspect based upon probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to arrest requires no probable cause or reasonable suspicion. Id. at 235. After placing Defendant under arrest, the officers were entitled to search Defendant incident to his arrest. See New York v. Belton, 453 U.S. 454, 461 (1981); Robinson, 414 U.S. at 224; United States v. Pratt,355 F.3d 1119, 1121, 1124 (8th Cir. 2004); United States v. Lewis, 183 F.3d 791, 793-94 (8th Cir. 1999).

Likewise, they were authorized to seize the firearm and the beer can which

---

[4] Although Defendant does not contest that the apartment owner provided consent for the officers both to enter the apartment and search the premises, the officers would have been justified in entering the premises in any event. Where, as here, officers have probable cause to believe that a defendant has committed a crime, they may pursue that person from a public place into a private dwelling to arrest him, as well as conduct a search for weapons, without violating the defendant's Fourth Amendment rights. Warden v. Hayden, 387 U.S. 294, 298-99 (1967); United States v. Santana, 427 U.S. 38, 42-43 (1976) (having previously made a controlled buy of heroin from defendant, police who observed defendant on front porch and who fled upon seeing police, were authorized to pursue defendant into residence and effect warrantless arrest); United States v. Jones, 204 F.3d 541, 543 (4th Cir. 2000) (after seeing apparent drug transaction, exigent circumstances justified entry into residence into which defendant fled from police); United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996) (after observing what appeared to be a drug transaction, and the possession of a firearm by the apparent purchaser, exigent circumstances justified pursuit of likely purchaser into residence into which he tried to escape). In addition, based upon these facts it was reasonable for the officers to fear for their own safety and to have concern, in light of Defendant's change of clothing, and the fact that other individuals, unknown to them, were in the apartment, that evidence might be destroyed. See United States v. Pierson, 219 F.3d 803, 805-806 (8th Cir. 2000).

Defendant discarded prior to taking flight. As the Supreme Court recognized in <u>Hodari D.</u>, there is no legal impediment to the officers seizing property that a defendant drops during the course of his flight and prior to the physical seizure of his person. <u>Hodari D.</u>, 499 U.S. at 629; <u>accord</u> <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124-125 (2000); <u>United States v. Segars</u>, 31 F.3d 655, 657-658 (8th Cir. 1994) (cocaine discarded by defendant while fleeing considered abandoned). Thus, Defendant's challenge to the seizure of evidence at the time of his first arrest should be rejected.

### D. <u>Identification of Defendant</u>

Defendant has asserted that the identification made by Ms. Washington should also be suppressed. A defendant's constitutional right to due process may be violated by pretrial confrontation procedures that are unnecessarily suggestive and conducive to an irreparably mistaken identification. <u>Stovall v. Denno</u>, 388 U.S. 293, 302 (1967). Because it is the likelihood of misidentification that violates the right to due process, the court's inquiry focuses on the reliability of the identification. <u>Neil v. Biggers</u>, 409 U.S. 188, 198 (1972).

As the Eighth Circuit has recognized, the courts use a two-step analysis to determine whether an identification is unreliable. <u>United States v. Martin</u>, 391 F.3d 949, 952 (8th Cir. 2004). First, the defendant must establish that the identification process used with the witness was "impermissibly suggestive." <u>Id.</u> <u>See generally</u>, <u>Biggers</u>, 409 U.S. at 198-99. Second, if the identification procedure was "impermissibly suggestive," then the court inquires "whether, under the totality of the circumstances of the case, the

suggestive confrontation created a very substantial likelihood of irreparable misidentification." Martin, 391 F.3d at 952 (internal quotations and citations omitted). "Pared to its essence, the second inquiry is whether the identification is reliable." Graham v. Solem, 728 F.2d 1533, 1541 (8th Cir.1984); accord Manson v. Brathwaite, 432 U.S. 98, 116 (1977); United States v. Daily, 488 F.3d 796, 803 (8th Cir. 2007).

In determining whether the identification is reliable, the court may look to such factors as the witness's opportunity to view the defendant, the witness's degree of attention, the accuracy of any prior description given by the witness, the witness's level of certainty in his or her identification, and the length of time between the occurrence described and the confrontation. Manson, 432 U.S. at 115; United States v. Johnson, 56 F.3d 947, 953-4 (8th Cir. 1995). The identification testimony may be admitted if the reliability of the identification judged by the above factors outweighs the effect of any undue suggestion. Id. Each case must be reviewed on its own facts. See Manson, 432 U.S. at 114.

In this instance, Defendant has not met his initial burden to demonstrate that the identification procedure used here was unduly suggestive. In assessing a photo array, the court has recognized that "'showing only a single suspect to the witness is the most suggestive and, therefore, the most objectionable method of pretrial identification.'" Daily, 488 F.3d at 804 n.7. This does not mean, however, that a show-up is ipso facto deemed "unduly suggestive." To the contrary, in United States v. Martinez, 462 F.3d 903, 911 (8th Cir. 2006), cert. denied, 127 S.Ct. 1502 (2007), the Eighth Circuit held that

a show-up in which the suspect was returned to the scene in handcuffs complied with the first part of the <u>Biggers</u> test and was not unduly suggestive.

> "Police officers need not limit themselves to station house line-ups when an opportunity for a quick, on-the-scene identification arises. Such identifications are essential to free innocent suspects and to inform the police if further investigation is necessary." "[A]bsent special circumstances of unfairness, prompt on-the-scene confrontations do not entail due process violations."

<u>Id.</u> at 910 (quoting <u>Brodnicki v. City of Omaha</u>, 75 F.3d 1261, 1265 (8th Cir. 1996)).

Although a show-up that involved only the two suspects was held to be unduly suggestive in <u>Clark v. Caspari</u>, 274 F.3d 507, 511(8th Cir. 2001), the procedures employed there were significantly dissimilar from those used here. In <u>Clark</u>, the defendants were the only two individuals shown to the witnesses; they were wearing the same clothes as they were wearing at the time of the robbery; the defendants were handcuffed and were surrounded by police; the officers had required the defendants lie face down while handcuffed; as the witnesses approached they observed the police officers hauling one of the defendants to his feet; and one of the witnesses, the one who identified both of the defendants, appeared to be visibly shaken by the events. <u>Id.</u> at 509, 511. Here, other individuals were present and shown to the witness, Defendant was not the only individual cuffed, Defendant was not being physically man-handled by the police or treated any differently than the other individuals shown to the witness, and Defendant was wearing distinctly different clothing than at the time of the robbery.

But even if the Court were to assume the procedures were unduly suggestive,[5] the identification here would not be subject to suppression because it is sufficiently reliable. The five factors identified in <u>Biggers</u> and <u>Manson</u> all support the reliability of the identification. First, Ms. Washington was able to observe Defendant numerous times, over a long period of time, and in three different settings that evening, and conversed with him both at the lounge and in the liquor store. All of these meetings – including the robbery itself – involved face to face meetings. Second, the witness's degree of attention would have been high while being robbed. And while the Court may assume she may have been nervous while being robbed, the facts suggest she had no reason to be anxious during her encounters with Defendant in the lounge or the liquor store. Third, she gave consistent descriptions of Defendant to the police which fairly match Defendant's description. Fourth, she identified Defendant quickly and appeared to be certain of her identification. Finally, at best only a few hours elapsed between the robbery and Ms. Washington's identification of Defendant. <u>See</u> <u>United States v. Lank</u>, 108 F.3d 860, 862 (8th Cir. 1997) (identification that occurred same day reliable). As such, even if one were to assume the procedures to be unduly suggestive, here the identification is sufficiently reliable to be admitted. <u>See</u> <u>Martinez</u>, 462 F.3d at 911 (finding, alternatively, even if the show-up was unduly suggestive, it was reliable where the teller had an

---

[5] The Court notes that neither the witness nor the officer most intimately involved in the identification process was available to testify at the hearing. But it is Defendant's burden to show the procedures were unduly suggestive, and he did not testify at the hearing, nor did he present the testimony of any of the other individuals present at the apartment that night.

opportunity to observe the robber, having directly dealt with him at the time of the robbery, was certain of her identification, and the identification occurred shortly after the robbery); Clark, 274 F.3d at 511-12 (though show-up found to be unduly suggestive, identifications found reliable where the witnesses had the opportunity to clearly view the perpetrators during the robbery, only thirty minutes elapsed between the crime and the show-up, and there was no evidence in the record to indicate that police prompted the witnesses to identify the defendants).

### E.  **Evidence Seized Following May, 2008 Arrest**

Defendant also challenges the seizure of the ammunition and any other evidence seized from Defendant at the time of his arrest on May 20, 2008.  It is undisputed that this arrest occurred pursuant to the warrant on the instant federal indictment.  As the sole grounds for his motion, Defendant asserts that the indictment, warrant, and arrest were the product of the unlawful stop, arrest, and identification made of Defendant on the night of the robbery.  As set forth above, however, there was nothing unlawful or improper about the arrest of Defendant in October, 2007.  And even if the identification by Ms. Washington were subject to suppression – a finding this Court does not make – it would not affect the validity of the October arrest or the arrest warrant issued herein, as the officers arrested Defendant in October prior to the identification, and had probable cause to do so.  Having lawful authority to arrest Defendant pursuant to the federal arrest warrant in May, 2008, they were also authorized, as discussed above, to search him incident to his arrest.

## F.  Statements Made by Defendant

On essentially the same basis, Defendant also seeks to suppress the statements he made at the time of his arrest in May, 2008.  Notably, Defendant does not contend that the statements made by him were not voluntary; rather, the only basis he asserts for suppression is his claim, once again, that the arrest and statements were the result of an allegedly illegal stop and arrest in October, 2007.  Again, having found no Fourth Amendment violation based on the events in October, 2007, Defendant's argument for suppression of his statements also fails.

Even if Defendant had made an independent challenge to the statements made by him, his statements would not be subject to suppression on this record in any event. Defendant's initial statement to the police, in which he first provided a false name, and then admitted to his true name, was made prior to being advised of his rights under Miranda.  But statements made by a defendant who is not given his warnings under Miranda may be suppressed only if in response to police interrogation while the defendant is in custody.  See Stansbury v. California, 511 U.S. 318, 321-22 (1994); United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc).  Here, Defendant's initial statement was not "custodial" for purposes of Miranda requirements.  See United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990) (citing factors).  When they first approached, the officers did not advise Defendant he was under arrest, did not restrain Defendant in any fashion, and made no show of force.  They simply walked up to Defendant, in the early evening, and asked him his name, while he was seated,

unrestrained, on the porch. As such, there is no basis for the suppression of any statements made prior to his arrest.

Defendant's other statements, regarding the ammunition, followed his arrest, but were made after he was advised of his rights under <u>Miranda</u>. A defendant may knowingly and intelligently waive his rights and agree to answer questions. <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of <u>Miranda</u> rights by the defendant. <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986). The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). <u>See also</u> <u>LeBrun</u>, 363 F.3d at 724. "A waiver is knowing if it is 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' It is voluntary if it is 'the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" <u>United States v. Syslo</u>, 303 F.3d 860, 865 (8th Cir. 2002) (citations omitted) (quoting <u>Moran,</u> 475 U.S. at 421); <u>accord</u> <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998) (noting two distinct dimensions of the inquiry). The statement must be voluntary, and not the product of any police conduct by which the

defendant's will is overborne.  Connelly, 479 U.S. at 170;  Haynes v. Washington, 373 U.S. 503, 513 (1963).

"The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry."  Dickerson v. United States, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are rare."  Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n. 20 (1984)).

Defendant's statements here were made shortly after his arrest, and after he had been advised of his rights under Miranda and indicated that he understood those rights. At the time he made these statements, Defendant was a thirty year old adult, who had had previous experience with law enforcement, and he did not appear to be mentally impaired in any fashion.  Further, the officers did not force or threaten him in any manner.  Indeed, the fact that Defendant both understood his rights and felt free to exercise those rights is shown by the fact that he refused to make a written statement.  Thus, the Court finds that Defendant's post-arrest statements were voluntary, and were made after he knowingly and voluntarily waived his Miranda rights.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence, Statements and Identification [Doc. No. 22] be **Denied**.

Trial in this matter has been scheduled for **October 6, 2008 at 9:00 a.m.** before the **Honorable Rodney W. Sipple**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 18th day of August, 2008.